# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ABINGDON DIVISION

| | |
|---|---|
| **DONALD R. YOUNG,** ) | |
|    Plaintiff ) | |
| ) | |
| v. ) | Civil Action No. 1:04cv00098 |
| ) | **MEMORANDUM OPINION** |
| **JO ANNE B. BARNHART**, ) | |
|   **Commissioner of Social Security,** ) | By:  Pamela Meade Sargent |
|    Defendant ) | United States Magistrate Judge |

In this social security case, I affirm the final decision of the Commissioner denying benefits.

## I. Background and Standard of Review

Plaintiff, Donald R. Young, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 (West 2003). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge upon transfer pursuant to the consent of the parties under 28 U.S.C. § 636(c)(1).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning

-1-

mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence, but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Young filed his application for DIB on or about January 2, 2002, and again on August 27, 2002, alleging disability as of June 30, 2000, based on lower back problems, diverticulosis, a knot on his right wrist and severe depression and agitation. (Record,("R."), at 68-71, 76-79, 95, 135.) The claim was denied initially and upon reconsideration. (R. at 40-42, 47, 49-51.) Young then requested a hearing before an administrative law judge, ("ALJ"). (R. at 52.) The ALJ held a hearing on October 22, 2003, at which Young was represented by counsel. (R. at 425-54.)

By decision dated January 26, 2004, the ALJ denied Young's claim. (R. at 16-28.) The ALJ found that Young met the disability insured status requirements of the Act through March 31, 2003.[1] (R. at 27.) The ALJ found that Young had not engaged in substantial gainful activity since June 30, 2000. (R. at 27.) The ALJ also found that the medical evidence established that Young suffered from severe impairments, namely degenerative disc disease at the L4-L5 level of the spine with mild central bulge and diverticulitis, but he found that Young did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R.

---

[1] Because Young was insured through March 31, 2003, he must prove that he was disabled at some point prior to April 1, 2003, in order to be eligible for DIB benefits.

-2-

Part 404, Subpart P, Appendix 1 on or before March 31, 2003. (R. at 23, 27.) The ALJ found that Young's allegations were not totally credible. (R. at 27.) The ALJ found that on or before March 31, 2003, Young retained the residual functional capacity to perform sedentary work[2] with a sit/stand option. (R. at 27.) Thus, the ALJ found that Young could not perform any of his past relevant work. (R. at 27.) Based on Young's age, education and work history and the testimony of a vocational expert, the ALJ concluded that Young could perform jobs existing in significant numbers in the national economy, including those of a cashier and an assembler. (R. at 28.) Thus, the ALJ found that Young was not disabled under the Act and was not eligible for DIB benefits. (R. at 28.) *See* 20 C.F.R. § 404.1520(g) (2004).

After the ALJ issued his decision, Young pursued his administrative appeals, (R. at 11), but the Appeals Council denied his request for review. (R. at 6-8.) Young then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2004). The case is before this court on Young's motion for summary judgment filed January 18, 2005, and on the Commissioner's motion for summary judgment filed February 22, 2005.

## *II. Facts*

Young was born in 1966, (R. at 76), which classifies him as a "younger person" under 20 C.F.R. § 404.1563(c). Young has a high school education and past work experience as a large truck mechanic and a welder. (R. at 96, 101, 427-28.)

---

[2]Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. *See* 20 C.F.R. § 404.1567(b) (2004).

Young testified that he did not grocery shop or go anywhere unless he had to do so. (R. at 437.) However, he stated that he was able to drive. (R. at 438-39.) Young testified that he would lie down and watch television during the day. (R. at 440.) He stated that he experienced difficulty sleeping. (R. at 440.) Young stated that he had been prescribed sleep medication, but it only made him tired and "flip and flop." (R. at 441.) Young testified that he was more irritable than he was in the past. (R. at 441.) However, Young stated that he felt like his medications helped him. (R. at 442.)

John Newman, a vocational expert, also was present and testified at Young's hearing. (R. at 443-46, 449, 450-53.) Newman classified Young's past work as a truck mechanic as heavy[3] and semi-skilled, with the skills being transferrable only to the medium[4] level of exertion. (R. at 444.) Newman was asked to consider a hypothetical individual of Young's age, education and skill level, who could perform light work,[5] who could stand, walk and sit for six hours each in an eight-hour workday and who could occasionally kneel, crouch and crawl. (R. at 444.) Newman testified that such an individual could perform jobs existing in significant numbers in the national economy, including those of a cashier and an assembler at the light exertional

---

[3] Heavy work involves lifting items weighing up to 100 pounds at a time with lifting or carrying of items weighing up to 50 pounds frequently. If someone can perform heavy work, he also can perform medium, light and sedentary work. *See* 20 C.F.R. § 404.1567(d) (2004).

[4] Medium work involves lifting items weighing up to 50 pounds at a time with lifting or carrying of items weighing up to 25 pounds frequently. If someone can perform medium work, he also can perform light and sedentary work. *See* 20 C.F.R. § 404.1567(c) (2004).

[5] Light work involves lifting items weighing up to 20 pounds at a time with lifting or carrying of items weighing up to 10 pounds frequently. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2004).

-4-

level.  (R. at 444.)  Newman was next asked to consider the same individual, but who could stand, walk and sit for four to six hours each in an eight-hour workday.  (R. at 445.)  Newman testified that such an individual could perform the sedentary jobs of a cashier and an assembler.  (R. at 445.)  Newman was next asked to consider the same individual, but who was restricted as set forth in Dr. Briggs's assessment.  (R. at 411-12, 445-46.)  Newman testified that such an individual could perform no jobs.  (R. at 446.)  Newman testified that an individual that had good use of the hands and fingers could perform the same jobs.  (R. at 446.)  Newman was next asked to consider the same hypothetical individual, but who could perform sedentary work, who required a sit/stand option and who had to lie down 75 percent of the time.  (R. at 449.)  Newman testified that such an individual could perform no jobs.  (R. at 449.)  However, Newman testified that if an individual did not have to lie down 75 percent of the time, then the same jobs would be available.  (R. at 449.)  Newman testified that an individual as set forth in the second and third hypotheticals, who also had no useful ability to deal with the public, could perform only production-type jobs, such as assemblers, hand packers, inspectors and checkers.  (R. at 452-53.)

In rendering his decision, the ALJ reviewed records from Albemarle Hospital; Virginia Beach Hospital; Atlantic Orthopaedic Specialists; Buchanan General Hospital; Clinch Valley Medical Center; Appalachian Rehab and Sports Medicine; Dr. T. Brian Cortellesi, M.D.; Dr. Jeffrey McConnell, M.D.; Dr. Larry Lipscomb, M.D.; Dr. Jim C. Brasfield, M.D.; Dr. Richard M. Surrusco, M.D., a state agency physician; Eugenie Hamilton, Ph.D., a state agency psychologist; Dr. Jackie Briggs, D.O.; Dr. Faisal Chaudhry, M.D.; Dr. Frank M. Johnson, M.D., a state agency physician; Joseph Leizer, Ph.D., a state agency psychologist; and Sharon J. Hughson, Ph.D., a licensed

clinical psychologist.

The record shows that Young saw Dr. Jackie Briggs, D.O., from December 20, 2000, to November 2, 2002. (R. at 294-345.) On May 19, 2001, Young complained of depression for the first time. (R. at 328.) On June 2, 2001, and June 16, 2001, Young complained of depression and anxiety. (R. at 326-27.) Dr. Briggs prescribed Xanax. (R. at 326.) On July 6, 2001, Young was diagnosed with depression. (R. at 324.) On July 11, 2001, Young continued to complain of anxiety. (R. at 323.) However, by August 25, 2001, Young had no complaints of depression or anxiety. (R. at 321.) On September 10, 2001, Young again complained of depression, but he noted that he was doing "ok" on his medications. (R. at 320.) On October 12, 2001, he again complained of depression. (R. at 319.) On October 26, 2001, Young was again diagnosed with anxiety and depression. (R. at 318.) He was continued on Xanax. (R. at 318.) On November 10, 2001, Young continued to complain of depression. (R. at 317.) On November 23, 2001, Young noted that Xanax helped alleviate his anxiety and helped him sleep, but he noted that he was still depressed. (R. at 316.) He was prescribed Paxil in addition to the Xanax. (R. at 316.) On January 21, 2002, Young was diagnosed with an anxiety disorder and depression. (R. at 314.) On February 20, 2002, March 22, 2002, April 5, 2002, April 19, 2002, May 4, 2002, May 18, 2002, June 1, 2002, June 15, 2002, June 29, 2002, and July 13, 2002, Young's condition and diagnoses remained unchanged. (R. at 303-12.) On July 27, 2002, Young had no complaints of anxiety or depression. (R. at 302.) On August 10, 2002, Young complained of increased anxiety and difficulty sleeping. (R. at 301.) On August 24, 2002, September 7, 2002, September 21, 2002, October 5, 2002, October 19, 2002, October 26, 2002, and November 2, 2002, Young's condition remained

unchanged. (R. at 294-300.) Over this time period, Dr. Briggs placed no restrictions on Young's work-related abilities.

On October 26, 2001, Young saw Dr. Larry G. Lipscomb, M.D., for an evaluation of his back pain. (R. at 256-63.) At that time, Dr. Lipscomb noted that, although Young complained of depression, he had never seen a psychiatrist. (R. at 260.) Young reported that he was aggravated and depressed all of the time. (R. at 260.) However, Dr. Lipscomb noted that Young's affect was full and he was fully oriented. (R. at 260.)

On March 20, 2002, Eugenie Hamilton, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), indicating that Young had a nonsevere affective disorder and a nonsevere anxiety disorder. (R. at 278-93.) Hamilton concluded that Young was not restricted in his activities of daily living, experienced only mild restrictions in social functioning and in maintaining concentration, persistence or pace and had experienced no episodes of decompensation. (R. at 288.) Hamilton noted that Young's restrictions were primarily a result of his physical condition, noting that Young's primary mental limitations included irritability and lack of desire for social interaction. (R. at 290.)

Young again saw Dr. Briggs from November 16, 2002, through July 26, 2003. (R. at 388-404.) Over this time period, Young continued to complain of anxiety and depression. (R. at 388-404.) He was continued on Xanax and Paxil. (R. at 388-404.) Dr. Briggs again placed no restrictions on Young's work-related abilities over this time period. (R. at 388-404.)

On February 5, 2003, Young saw Dr. Faisal Chaudhry, M.D., for a consultation at the request of the Virginia Department of Rehabilitative Services. (R. at 356-62.) Dr. Chaudhry noted, per Young's report, that Young had a history of a mild anxiety disorder with depression due to chronic back pain. (R. at 357.) However, Dr. Chaudhry further noted that Young was stable on medications. (R. at 357.) Young was diagnosed with, among other things, generalized anxiety disorder with depression, stable. (R. at 358.) Dr. Chaudhry placed no restrictions on Young's work-related abilities.

On July 8, 2003, Joseph Leizer, Ph.D., a state agency psychologist, completed a PRTF, indicating that Young suffered from a nonsevere affective disorder and a nonsevere anxiety disorder. (R. at 371-84.) Leizer concluded that Young was not restricted in his activities of daily living, experienced no difficulties in maintaining social functioning, experienced only mild difficulties in maintaining concentration, persistence or pace and had experienced no repeated episodes of decompensation. (R. at 381.)

Young saw Sharon J. Hughson, Ph.D., a licensed clinical psychologist, on October 14, 2003, for a psychological evaluation at the request of his counsel. (R. at 413-22.) Young reported that his medications prevented him from becoming so mad. (R. at 413.) He stated that he never sought nor received any psychiatric treatment in spite of rather extreme psychological problems. (R. at 414.) Hughson noted that Young's general fund of information was fair, he was fully oriented, his thoughts were coherent and clear and he denied homicidal ideation, delusions, hallucinations, amnesia and depersonalization experiences. (R. at 415.) Young noted that he had a history of violence, and Hughson stated that Young seemed extremely agitated and was

belligerent. (R. at 415.) However, Young denied having difficulty getting along with family, despite his complaints relating to his marriage and that he never saw his family of origin. (R. at 415.) He denied having difficulty getting along with strangers. (R. at 415.) Young stated that he drove himself to the evaluation. (R. at 415.) Young reported that he did not take his medications on the day of the evaluation for fear of being charged with driving under the influence. (R. at 416.) Young stated that he watched television, took walks and could use a telephone, but found the directory difficult to use. (R. at 416.) He stated that he did not perform any yardwork, shop, cook, perform any household chores, visit or receive visits from others. (R. at 416.) Hughson noted that Young was well-motivated and alert throughout the evaluation, but his attitude interfered with his interaction. (R. at 416.) Hughson further noted that Young might have some reading and writing limitations. (R. at 416.) She estimated Young's IQ to be in the low average range, but opined that he might have some learning problems. (R. at 416.)

Hughson administered the Personality Assessment Inventory, ("PAI"), which suggested that Young might not have answered some of the questions in a completely forthright manner, that he might be in denial about drinking or drug use and that he attempted to portray himself in a negative or pathological manner in particular areas. (R. at 416-17.) Hughson reported that the PAI revealed elevated scores on the depression scale, the somatoform scale and the anxiety scale. (R. at 417-18.) However, Hughson noted the possibility that the scales might overrepresent or exaggerate the actual degree of psychopathology. (R. at 417.) Hughson diagnosed Young with a pain disorder associated with both psychological factors and a general medical condition, intermittent explosive disorder, alcohol abuse in full sustained

remission per patient report and paranoid personality disorder. (R. at 421.) Nonetheless, Hughson concluded that Young was capable of managing his own funds. (R. at 422.) She opined that he should seek psychotherapy to improve his condition and learn to deal with his chronic pain in a more adaptable way. (R. at 422.)

Hughson also completed a Mental Assessment Of Ability To Do Work-Related Activities. (R. at 423-24.) She found that Young had an unlimited or very good ability to maintain attention and concentration, to understand, remember and carry out simple job instructions, a good ability to understand, remember and carry out detailed job instructions and to maintain personal appearance and a fair ability to follow work rules and to understand, remember and carry out complex job instructions. (R. at 423-24.) In all other areas of functioning, Hughson concluded that Young had a poor or no ability. (R. at 423-24.)

### *III. Analysis*

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2004); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 404.1520 (2004). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a) (2004).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 423(d)(2) (West 2003); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated January 26, 2004, the ALJ denied Young's claim. (R. at 16-28.) The ALJ found that Young met the disability insured status requirements of the Act through March 31, 2003. (R. at 27.) The ALJ found that Young had not engaged in substantial gainful activity since June 30, 2000. (R. at 27.) The ALJ also found that the medical evidence established that Young suffered from severe impairments, namely degenerative disc disease at the L4-L5 level of the spine with mild central bulge and diverticulitis, but he found that Young did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1 on or before March 31, 2003. (R. at 23, 27.) The ALJ found that Young's allegations were not totally credible. (R. at 27.) The ALJ found that on or before March 31, 2003, Young retained the residual functional capacity to perform sedentary work with a sit/stand option. (R. at 27.) Thus, the ALJ found that Young could not perform any of his past relevant work. (R. at 27.) Based on Young's age, education and work history and the testimony of a vocational expert, the ALJ concluded that Young could perform jobs existing in significant numbers in the

national economy, including those of a cashier and an assembler. (R. at 28.) Thus, the ALJ found that Young was not disabled under the Act and was not eligible for DIB benefits. (R. at 28.) *See* 20 C.F.R. § 404.1520(g) (2004).

As stated above, the court's function in the case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained her findings and her rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Young argues that the ALJ erred by rejecting the opinion of psychologist Hughson regarding his mental impairments. (Brief In Support Of Plaintiff's Motion For Summary Judgment, ("Plaintiff's Brief"), at 4-5.) Young also argues that the ALJ further erred by failing to adequately develop the record regarding the severity of his depression and anxiety. (Plaintiff's Brief at 4-5.) For the following reasons I disagree.

Young first argues that the ALJ erred by rejecting Hughson's opinion. Specifically, he contends that it was improper for the ALJ to reject this opinion based on the fact that his counsel arranged the examination in hopes of receiving a favorable decision regarding his disability status. Young further contends that it was inappropriate for the ALJ to reject Hughson's opinion based on the fact that Hughson

was presumably paid to perform this evaluation. While it is true that the ALJ did mention these things in his discussion of Hughson's evaluation, as the Commissioner notes in her brief, these were not the only reasons the ALJ rejected Hughson's findings. For instance, the ALJ stated that he was rejecting Hughson's opinion because she relied heavily on subjective statements made by Young regarding his alleged symptoms, despite her finding that Young had no ability to be reliable. (R. at 22, 424.) Moreover, as the ALJ noted in his decision, Hughson's findings are internally inconsistent. For instance, Hughson found that Young had a poor or no ability in nine out of 12 areas of personal-social adjustment. (R. at 423-24.) However, despite such harsh limitations, she nonetheless concluded that Young was capable of managing his own funds. (R. at 424.) Next, Hughson stated in her report that testing suggested that Young was attempting to portray himself in a negative manner and that such patterns were relatively common among individuals feigning a mental disorder. (R. at 22-23, 417.)

I further note that Hughson's findings are inconsistent with the medical evidence of record as a whole. For instance, Young's treating physician, Dr. Briggs, treated Young's depression and anxiety conservatively with medications over an almost three-year period. Dr. Briggs never placed any restrictions on Young's work-related abilities. In October 2001, although Young complained of depression, he admitted that he had never sought nor received psychiatric or psychological treatment, and Dr. Lipscomb reported that Young had a full affect and was fully oriented. (R. at 260.) Likewise, in March 2002, psychologist Hamilton concluded that Young had only a nonsevere affective disorder and a nonsevere anxiety disorder. (R. at 278-93.) Hamilton concluded that Young was not restricted in his activities of daily living,

experienced only mild restrictions in social functioning and in maintaining concentration, persistence or pace and had experienced no episodes of decompensation. (R. at 288.) Moreover, Hamilton noted that Young's restrictions were primarily a result of his physical condition. (R. at 290.) Similarly, Dr. Chaudhry noted that Young was stable on medications and he placed no restrictions on his work-related abilities. (R. at 357.) Finally, in July 2003, psychologist Leizer concluded that Young suffered from a nonsevere affective disorder and a nonsevere anxiety disorder. (R. at 371.) Leizer found that Young was not restricted in his activities of daily living, experienced no difficulties in maintaining social functioning, experienced only mild difficulties in maintaining concentration, persistence or pace and had experienced no episodes of decompensation. (R. at 381.)

Moreover, Young stated on several occasions that his medications helped to alleviate his symptoms related to anxiety and depression. For instance, at his hearing, he testified that his medications helped him. (R. at 442.) In September 2001, Young noted that he was doing "ok" on his medications. (R. at 320.) In November 2001, he stated that Xanax helped relieve his anxiety. (R. at 316.) In October 2003, Young reported that his medications helped to control his anger. (R. at 413.) It is well-settled that "[i]f a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986).

Finally, I note that the Commissioner correctly states in her brief that Hughson performed the evaluation of Young approximately six months after the expiration of Young's disability insured status. Moreover, Hughson's evaluation, performed in October 2003 does not relate back to a time period prior to April 1, 2003, when

Young met the disability insured status requirements of the Act.

For all these reasons, I find that the ALJ properly weighed the medical evidence and that substantial evidence supports his decision to reject Hughson's opinion.

Young further argues that the ALJ failed to adequately develop the record regarding the severity of his mental impairments. (Plaintiff's Brief at 4-5.) While Young is correct that such a duty exists, *see Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986), here, the ALJ clearly fulfilled this obligation. In *Cook*, the court held that "the ALJ has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record." *Cook*, 783 F.2d at 1173. Moreover, pursuant to 20 C.F.R. § 404.1513(e) (2004), the medical evidence must be complete enough to make a determination regarding the nature and effect of the claimed disability, the duration of the disability and the claimant's residual functional capacity. Here, the record is replete with evidence regarding the nonsevere nature of Young's mental impairments and the resulting mild limitations prior to April 1, 2003. Given this evidence, I find that the record is more than complete enough to make a determination regarding Young's mental impairments and their associated work-related limitations. Thus, I find that the ALJ had no duty to further develop the record.

### *IV. Conclusion*

For the foregoing reasons, Young's motion for summary judgment will be denied, the Commissioner's motions for summary judgment will be granted and the Commissioner's decision to deny benefits is affirmed.

I further deny Young's request to present oral argument based on my finding that it is not necessary in that the parties have more than adequately addressed the relevant issues in their written arguments.

An appropriate order will be entered.

DATED:    This 25th day of May, 2005.

/s/  Pamela Meade Sargent

UNITED STATES MAGISTRATE JUDGE